## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District Eastern District of Missouri |
|---|---|
| Name (under which you were convicted): Joseph Harden | Docket or Case No.: |

| Place of Confinement:<br>South Central Correctional Center | Prisoner No.:<br>286322 |
|---|---|

| Petitioner (Include the name under which you were convicted) | Respondent (authorized person having custody of petitioner) |
|---|---|
| Joseph Harden        v. | Michael Bowersox |

| The Attorney General of the State of Missouri |
|---|

### PETITION

1. (a) Name and location of court that entered the judgment of conviction you are challenging: _____
   Circuit Court of Pemiscot County, Missouri, Pemiscot County Courthouse,
   610 Ward Ave., P.O. Box 34, Caruthersville, MO 63830

   (b) Criminal docket or case number (if you know): 08F2-CR00631

2. (a) Date of the judgment of conviction (if you know): January 29, 2010
   (b) Date of sentencing: March 29, 2010

3. Length of sentence: life without parole/life/ 10/10

4. In this case, were you convicted on more than one count or of more than one crime? Yes ☒ No ☐

5. Identify all crimes of which you were convicted and sentenced in this case: _____
   Murder in the first degree/Robbery in the first degree/ Armed Criminal
   Action/Armed Criminal Action

6. (a) What was your plea? (Check one)
   (1) Not guilty ☒        (3) Nolo contendere (no contest) ☐
   (2) Guilty ☐        (4) Insanity plea ☐

   (b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or
   charge, what did you plead guilty to and what did you plead not guilty to? _____

(c) If you went to trial, what kind of trial did you have? (Check one)

    Jury ☐       Judge only ☒

7. Did you testify at a pretrial hearing, trial, or a post-trial hearing?

    Yes ☒  No ☐

8. Did you appeal from the judgment of conviction?

    Yes ☒  No ☐

9. If you did appeal, answer the following:

    (a) Name of court: Missouri Court of Appeals, Southern District

    (b) Docket or case number (if you know): SD30479

    (c) Result: The judgment of the trial court was affirmed

    (d) Date of result (if you know): June 17, 2011

    (e) Citation to the case (if you know): no citation

    (f) Grounds raised: Point I: The trial court erred in overruling Joe's Motion

for Judgment of acquittal on Counts 4 (robbery 1st) and 6 (Armed Criminal

Action) because the evidence was insufficient to prove guilt; and

Point II: The trial court erred in overruling Joe's Motion for Judgment

of acquittal on Counts 1 (Murder 1st) and 3 (Armed Criminal Action)

because the evidence was insufficient to prove guilt.

    (g) Did you seek further review by a higher state court?  Yes ☒  No ☐

    If yes, answer the following:

    (1) Name of court: Supreme Court of Missouri

    (2) Docket or case number (if you know): SC91916

    (3) Result: Transfer to the Supreme Court of Missouri was denied

    (4) Date of result (if you know): August 30, 2011

    (5) Citation to the case (if you know): no citation

    (6) Grounds raised: Granting transfer would allow this Court to clarify

that merely drawing a reasonable inference is not sufficient to

prove an element of or guilt of a charged offense beyond a

reasonable doubt.

    (h) Did you file a petition for certiorari in the United States Supreme Court?  Yes ☐  No ☒

    If yes, answer the following:

    (1) Docket or case number (if you know): _____

(2) Result: _____

_____

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?

Yes ☒ No ☐

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court: Circuit Court of Pemiscot County, Missouri

(2) Docket or case number (if you know): 11PE-CC00565

(3) Date of filing (if you know): November 23, 2011

(4) Nature of the proceeding: Post-Conviction Motion under Rule 29.15

(5) Grounds raised: i) Trial counsel were ineffective for failing to file a motion to dismiss charges or dismiss the State's notice of death based on the grounds of prosecutorial vindictiveness; ii) Trial counsel were ineffective for failing to request the trial court to strike Donald Booth's testimony.

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?     Yes ☒   No ☐

(7) Result: Motion overruled.

(8) Date of result (if you know): August 30, 2012

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?     Yes ❏   No ❏

(7) Result: _____

(8) Date of result (if you know): _____

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?     Yes ❏   No ❏

(7) Result: _____

(8) Date of result (if you know): _____

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition:     Yes ❏   No ☒☒

(2) Second petition:    Yes ❏   No ❏

(3) Third petition:     Yes ❏   No ❏

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

Transfer to the Mo. S. Ct. is an extraordinary remedy that is not required for exhaustion of Federal Habeas Corpus claims. Mo. Rule 83.04; and Randolph v. Kemna, 276 F.3d 401, 404 (8th Cir. 2002).

12. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

GROUND ONE: Insufficient evidence for Robbery 1st and ACA convictions; (Due process clauses, 5th and 14th Amend., U.S. Constitution)

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): See Additional pages

(b) If you did not exhaust your state remedies on Ground One, explain why: _____

(c) Direct Appeal of Ground One:

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☒ No ☐

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

(d) Post-Conviction Proceedings:

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court? Yes ☐ No ☒

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

Additional page ONE for GROUND ONE 12.(a)


Supporting Facts


• On January 28, 2010 Petitioner (Harden) was charged in Count
4 of an Amended Information, that he: "in violation of Section
569.020 RSMo. committed the class A felony of robbery in the
first degree, punishable upon conviction under Section 558.011.1
RSMo., in that on or about July 8, 2008, in the County of
Pemiscot, State of Missouri, the defendant forcibly stole a
wallet owned by Albert Lynn Harper, and in the course thereof
defendant caused serious physical injury to Albert Lynn Harper.";

   and in Count 6, that he: "in violation of Section 571.015
RSMo., committed the class felony of armed criminal action,
punishable upon conviction under Section 571.015 RSMo., in
that on or about July 8, 2008, in the County of Pemiscot,
State of Missouri, the defendant committed the felony of robbery
in the first degree charged in Count IV, all allegations of
which are incorporated herein by reference, and the defendant
committed the foregoing felony of robbery in the first degree
by, with and knowingly through the use, assistance and aid of
a dangerous instrument, to-wit: a concrete block." Legal File
on Direct Appeal (L.F. SD30479) at 58-59

Additional page TWO for GROUND ONE 12.(a)


· On July 7, 2008 Danny Singletary, who lived in Dyersburg, Tennessee called Joe Harden for a ride to Al Harper's house in Paragould, Missouri (Tr. 44-47). Joe and his wife drove to Dyersburg on July 7th, picked up Danny, and drove him to Al's house in Paragould (Tr. 47-48). Danny, Al, and Joe went to an ATM machine; Al took out $200 and gave Joe $70 for bringing Danny to Paragould (Tr. 49, 55-56). Joe and his wife then drove to Kennett, Missouri (Tr. 48).

· Later that evening Danny called and asked Joe for a ride back to Dyersburg to pick up more clothes and drugs (Tr. 48-50, 56). Joe and his wife drove back to Paragould to get Danny (Tr. 50). After a stop in Kennett Danny, Al, and Joe headed to Dyersburg (Tr. 50-52). Danny was driving and all of them had been drinking and using drugs (Tr. 52-54). Just before reaching Hayti, Missouri Danny tried to pass a truck and ended up off the road and in the grass with the front and rear tires blown out on the driver's side (Tr. 54). Danny was trying to get over the median to the right side of the road when he was stopped by Hayti police officer Brad Jones and arrested for driving while intoxicated (Tr. 54, 72-73). The stop occurred at about 3:30 a.m. near Highway 84 in front of the First State Bank (Tr. 72-73).

· Officer Jones' trial testimony was that Joe was wearing a

2.

Additional page THREE for GROUND ONE 12.(a)

sleeveless T-shirt, black jeans, a red baseball-type cap and a
pair of boots - not flip flops (Tr. 74-76; StEx-7). Joe's
booking photo depicted the way Joe appeared on July 8th at his
arrest and how his hair was at the time of the arrest (Tr. 84,
227, 264-65; DefEx-B). Officer Jones did a pat down search of
Joe and found a pocket knife (Tr. 77). Al Harper was wearing
a white T-shirt with sleeves, blue jeans, sandals and a
camouflaged hat (Tr. 74-76; StEx-7).

· At approximately 4:00 a.m., after the car had been searched
and they had been searched, Joe and Al were released (Tr. 73-
75). When Jones left to take Danny to the police station Al and
Joe were at or near First State Bank's ATM machine (Tr. 75).
Officer Jones did not observe any animosity between Joe and Al -
Both were alive, well, and getting along (Tr. 83). Two ATM cash
withdrawals on July 8th, one at 4:23 a.m. and the other at 4:25
a.m., were documented on videotape and in bank records (Tr. 89-
92; StEx's 8and 9). The first withdrawal was for $20 and the
second was for $200 (tr. 90). ·

· At about 5:30 a.m. on July 8th Chakita Johnson drove past
Brown's Grocery en route to pick up her brother to take him
to work (Tr. 95). She saw two men, one on the pay phone and one
sitting down (Tr. 95-96). After taking her brother to work, she

Additional page FOUR for GROUND ONE 12.(a)


returned home and again passed Brown's Grocery; this time both
men were sitting down (Tr. 95). The two men were white (Tr. 95).
One was skinny and the other was a little chubby (Tr. 96). They
were close to the store, near the trash can and pay phone (Tr.
97). They appeared to be waiting for someone (Tr. 97).

· Between 7:00 and 7:30 a.m. Bruce Sams was driving westbound on
Highway 84 en route to work (Tr. 99). As he passed Neely's shop
building Sams saw a white male wearing a ball cap and blue jeans
cut off at the knees coming out from Mr. Neely's shop (Tr. 99-
100, 103-04). He appeared to be walking towards old 84 (Tr. 100-
01). The man was shirtless and had tattoos on his chest and arms
(Tr. 100-01). Sams thought it looked like he had two caps on,
one forwards and one backwards - like an old trucker hat (Tr.
100-01). The man wasn't carrying anything (Tr. 102). He was
stocky but not overweight and in his late 30's to early 40's
(Tr. 105).

· Neely Mitchell's farm shop is at 50 West State Highway 84
just west of Hayti Heights and about 250-300- yards from Brown's
Grocery (Tr. 106-07). At about 7:15 a.m. on July 8th Neely
Mitchell was driving west on Highway 84 and saw a white male
walking east on the north side of 84 highway carrying something
in one of his hands (Tr. 107, 110-11). When Mitchell saw him

4

Additional page FIVE for GROUND ONE 12.(a)

the man was 25 to 30 feet west of the drive to Brown's Store (Tr. 108). The man wore bluejeans and was shirtless (Tr. 108). Mitchell noticed the man's hair was visible on the neck and he had letters approximately an inch high tattooed across the upper part of his back (Tr. 108-09). [Danny Singletary testified that Joe has some kind of tattoos on his shoulders and his name "Harden" tattooed across his back (Tr. 46)] The man was just right across the road that runs on the west side of Brown's (Tr. 114-15; DefEx-A). On cross-examination Mitchell acknowledged that he had told the prosecutor that this man had long stringy hair (Tr. 115). The man was not wearing a hat (Tr. 118). Mitchell acknowledged that he could not identify the man he saw (Tr. 118).

· Mitchell arrived at his shop, got out of his truck, and let his dog out (Tr. 111). He walked to the rear north side of his shop and saw a man, apparently dead, lying face up with a white T-shirt covering his head and face and a ladder, chained to the shop, partially over him (Tr. 111-12; StEx-11). In the area of the body there were variously-sized rock-type remnants of the foundations of demolished former tenant dwellings (Tr. 119). Mitchell called the Sheriff; his phone records indicate that he made that call at 7:40 a.m. (Tr. 117; DefEx-C). Almost simul- taneously Deputy Joe Bryant drove past the shop and Mitchell

5

Additional page SIX of GROUND ONE 12.(a)


waved at him (Tr. 112, 118, 127-29). Seconds later Bryant
received a call concerning the dead body at Mitchell's shop
and went there (Tr. 128). Bryant was then much closer to Brown's
Grocery and did not see anyone at Brown's or in the vicinity
(Tr. 138-39).

· On the west side of Mitchell's shed, which was visible from
the roadway, Bryant found an accumulaiton of blood and drag
marks indicating that someone had been dragged from that spot
to the rear of the building out of view of the road (Tr. 139-
40)

· Chief Sheckell testified that Joe became a suspect because
he was in the car with Al and Danny when the car was stopped
(Tr. 147). Joe's father and brother called and asked Sheckell
why the police were looking for Joe, and eventually Joe called
and spoke to Sheckell (Tr. 147-48). Joe said he had done nothing
wrong; that he had been helping a black lady - didn't know her
name - move a television set that morning and that she had
given him a ride to Kennett (Tr. 149). Joe also said that he
and Al had gone to the bank; Al withdrew some money from the ATM,
gave Joe $100 and then they seperated (Tr. 153-54).

· Bryant testified that it is approximately a mile from First

6

Additional page SEVEN for GROUND ONE 12.(a)


State Bank to Brown's Grocery and a few hundred yards from
Brown's to Mitchell's shop (Tr. 130). He estimated that Elinore
Booth's home on North Walnut Street is about a half mile from
Brown's Grocery (Tr. 130-31). On a lot adjacent to Booth's home
under a concrete porch Bryant found a camouflage baseball hat
and a white sleeveless T-shirt (Tr. 131-136; StEx's 31, 32, 35,
and 36).


· On July 8, 2008 Lt. Ryan Holder and Mo. State Hwy. Ptrl. Sgt.
Stoelting interviewed Joe at the Kennett Police Department (Tr.
227-28) They made no attempt to record any part of the interview
(Tr. 228, 258). According to Stoelting, in response to questions
that he and Holder asked, Joe said that he did not know where Al
was - he last saw Al walking west from Brown's Grocery (Tr. 239).
Al got $200 from the ATM and gave Joe $75 (Tr. 239). They walked
together to Brown's Grocery and Joe used Al's phone card to call
his wife and also to call a friend, Mr. Turner, for a ride (Tr.
240-41). After waiting for Turner, who never came, Joe began
walking towards Kennett (Tr. 241). On Pascola Road he helped
a black woman and man load a TV into their car, then rode with
them to another house to unload it (Tr. 241). Joe asked the
woman if he could pay her for a ride to Kennett; she said she
was going anyway and would take him (Tr. 242). He offered her
$40 and gave her $15 (Tr. 242). After pumping gas for her in

Additional page EIGHT for GROUND ONE 12.(a)


Kennett near Walmart he called his brother from the Dairy
Queen (Tr. 243). Joe's brother took Joe to Paragould so Joe could
get his wife and then back to Kennett; Joe was arrested after
returning to Kennett (Tr. 243-45).

· According to Stoelting Joe at first denied going into Walmart
but eventually said he bought jeans, a shirt, and shoes at Walmart
and gave the pants to a Walmart employee to throw away because
they were sweaty or nasty (Tr. 247-52). When Stoelting accused
Joe of lying Joe said he did not kill Al and wanted an attorney
(Tr. 252). At some point before this Joe agreed to give a
buccal swab (Tr. 254-55). Later Joe said that if he could have
a cigarette he would think about telling Stoelting what happened
(Tr. 253). Joe got a cigarette then said that earlier in the
evening Al and Danny had gotten into a fight and Joe got blood
on his jeans breaking up the fight (Tr. 253).

· Sheckell's investigation led him to Elinore Booth and her son
Donald (Tr. 149050). Sheckell spoke to Donald who said that
the white guy had put a shirt and a hat under some steps on the
vacant lot next to their house (Tr. 151). Sheckell and Bryant
found a baseball hat and a T-shirt in a lot next to the Booth
house and Bryant seized these items (Tr. 146, 151; StEx's 35
and 36).

8

Additional page NINE for GROUND ONE 12.(a)


· Elinore Booth testified that she and her son were picking up
a TV that the owner had put out to be recycled when a white man
came up and spoke to her about someone they both knew (Tr. 163-
65). The man helped her load the TV and offered to pay her to
take him to Kennett (Tr. 165). Ms. Booth told him she was
planning to go to Kennett but he paid some (Tr. 165). Before
going to Kennett Ms Booth stopped at her house to unload the TV
(Tr. 166). Ms. Booth and the white man then drove to Kennett
(Tr. 170-71). Ms. Booth stopped to get gas; she paid for it and
the white man pumped it for her (Tr. 166-67). She let the man
out in front of the Kennett Walmart store (Tr. 167).


· Donald Booth testified that when they got to his mother's
house to unload the TV the man threw the clothes down in the
porch in the lot next door (Tr. 173-74).


· After leaving Ms. Booth Joe went to Walmart (Tr. 186, 188).
As Joe was walking into the store Walmart employee Tim Fortune
noticed that Joe did not have a shirt on (Tr. 186). Fortune saw
Joe again when he came out of the fitting room; Joe bought a
pair of pants, a belt, a shirt and a pair of shoes (Tr. 186-87).
Joe said he got gas soaked working on his vehicle (Tr. 187).
At the register Joe gave Fortune his old pants to throw away
(Tr. 187-88). Surveillance tapes from the Kennett Walmart showed

Additional page TEN for GROUND ONE 12.(a)


Joe entering and shopping at the store (Tr. 196-99). The pants that Joe had given to Fortune to throw away were stained with blood and were recovered (Tr. 201-02).

· Investigators working on the case found a black leather wallet belonging to Al in a trash can outside of Brown's Grocery near a phone up against the store building (Tr. 222, 260-61). The wallet had Harper's debit/credit card and some personal items; it did not contain any money (Tr. 222-26). On July 11, 2008, after Joe had been arrested and confined investigators found a knife midway between Brown's Grocery and Mitchell's shop (Tr. 219-21, 226-27).

· Diane Higgins, a forensic scientist at the Missouri State Highway Patrol Crime Lab, tested the evidence seized. Higgins' testing showed that the blood on a concrete block seized at Mitchell's farm, the stains on Joe's jeans, and the stain on the sleeveless T-shirt were all consistent with Al Harper's blood (Tr. 277-78). Blood on·the blade of the black knife seized from the roadside between Mitchell's farm and Brown's Grocery produced a partial DNA profile consistent with Al Harper (Tr. 280-81, 296). [Danny testified that he was at Reelfoot Lake with Joe and his wife a week or two before Al was killed and that Joe had a knife then (Tr. 56-57). Joe also had a knife at Al's

Additional page ELEVEN for GROUND ONE 12.(a)

house that he pulled out when they were making sandwiches (Tr. 57-58). Danny identified StEx-6 as a picture of the knife (Tr. 58; StEx-6)]. Higgins' testing of the inside of the sleeveless T-shirt (tank top) showed a mix of the DNA of at least two individuals; Joe and Al could not be excluded as contributors to this mix (Tr. 281-82). Al could not be excluded as the source of the DNA on the inside of the camouflage cap (Tr. 283-84). There was insufficient DNA on the handle of the black knife for DNA testing, although testing of the knife handle revealed alleles that did not match Joe's DNA profile (Tr. 284-85, 298). There were no fingerprints on the wallet found at Brown's Grocery (Tr. 284-85). Higgins testified that DNA from one person will transfer to another person by physical contact; Squeezing someone's hand or pulling up a pair of pants could transfer DNA to another person's hand or to the pants (Tr. 303).

• A report of the autopsy performed by Dr. Zaricor and the accompanying lab report were admitted into evidence by stipu-Lation (Tr. 21-23). According to the report the time of death was 7:30 a.m. and the cause of death was primarily massive blunt trauma which crushed Al's head and face. Knife wounds to Al's neck were inflicted while he was still alive; stab wounds on his chest appear to be post-mortem. Lab analysis found measurabale amounts of Diazepam, Nordiazepam, Cocaine and Tramadol in Al's

Additional page TWELVE for GROUND ONE 12.(a)


blood. Dr. Zaricor wrote that at death Al was grossly intoxicated
and potentially stuperous with toxic levels of cocaine, alcohol
and Tramadol in his body (SrEx-5).

• At the close of the State's case Joe moved for a judgment of
acquittal on all counts which the trial court overruled (Tr. 304-
06; L.F. 62-62).

• Gene Turner testified on deposition that Joe called the Turner
house on July 8 at about 5:45 a.m. (Turner Deposition (Depo.) 5).
[The deposition of witness Gene Turner was admitted into evidence
in lieu of live testimony (Tr. 23, 306; DefEx-E)]. Joe said he
was in front of Brown's Grocery with another guy and wanted to
go to Kennett (Turner Depo. 7-8). He told Gene he had alot of
money and might ask Turner to take him to Paragould (Turner
Depo. 8-9). Both Turner and his wife, who first spoke to Joe,
told Joe that Gene had an early appointment with the eye doctor
and would not have time to go get Joe (Turner Depo. 6-9). Joe
persisted and Gene said that if he had time he would pick up
Joe, but if Gene did not get to the store by 6:15 a.m. he wasn't
coming (Turner Depo. 10). Joe thanked Gene and hung up; Gene was
running late and never went to Brown's (Turner Depo. 10).

• Joe Harden testified in his own defense at trial; After being

12

Additional page THIRTEEN for GROUND ONE 12.(a)


stopped in Hayti he and Al went to the ATM (Tr. 314-16). Al
tried to take out $200 and got $20; Joe helped him get $200 and
Al gave Joe $75 for bringing Danny to Dyersburg (Tr. 316). While
the car was being loaded onto the tow truck Joe put his boots
into the car and got his flip flops (Tr. 317). Al and Joe then
began walking (Tr. 317). When they reached the railroad tracks
at the beginning of Hayti Heights Al (who had downed some pre-
scription medication when the car was pulled over) fell down face
first and rolled into a ditch busting his nose and mouth (Tr. 317-
18). Joe sat down to pull Al out of the ditch and in doing so
Joe got blood on his pants (Tr. 318).


· Joe and Al got to Brown's and stopped. Al's shirt was bloody
from his fall; Joe gave his shirt to Al to wipe his face (Tr.
318). Using Al's phone card Joe called his wife and then called
a family friend, Gene Turner, for a ride (Tr. 319-20). Gene
agreed to come so Al and Joe waited; eventually it became appar-
ent that Gene was not coming (Tr. 319). Joe saw a woman loading
a TV into a truck (Tr. 321). Telling Al to wait Joe wnt to help
and see if he could get a ride if he offered her some money (Tr.
321-22). That was the last Joe saw of Al (Tr. 322). After the TV
was loaded on the truck the woman drove to her home and the TV
was unloaded (Tr. 322). The woman gave Joe a ride to Kennett;
they passed Brown's Grocery and Al was not there (Tr. 322). Al

Additional page FOURTEEN for GROUND ONE 12.(a)

still had Joe's shirt when Joe went to help load the TV onto the truck (Tr. 323). Joe did not have any arguments with Al - both he and Al were trying to help Danny (Tr. 323).

· In Kennett Joe pumped gas for Ms. Booth and offered her $20 (Tr. 323-24). Joe called his brother from Walmart and while waiting for his brother Joe bought shoes, blue jeans and a shirt (Tr. 324).

· From his father Joe subsequently learned that the Hayti police were looking for him (Tr. 325). Joe called Chief Sheckell; Sheckell would not tell Joe what was going on - just that he would pick up Joe (Tr. 325-26). Joe and his wife went to a friend's house where Joe again called Sheckell (Tr. 327). While Joe was talking to Sheckell Holder and Stoelting arrived and took him to the police station (Tr 328).

· Holder and Stoelting asked Joe stupid questions such as whether Al made homosexual advances; and Joe responded with stupid answers (Tr. 329, 331). In response Joe told the police that he had not harmed or killed Al and that Al fell and busted his face (Tr. 329-30). Joe said he had no quarral with Al and that Al had paid him as agreed (Tr. 333). Joe testified that he did not take any thing from Al or try to rob him; that there was not enough time

14

Additional page FIFTEEN for GROUND ONE 12.(a)

to kill someone, move a TV set and get to Kennett all in 32
minutes (Tr. 333-34). Joe was sorry that he gave stupid answers
to Stoelting's questions (Tr. 334). Joe denied that he went to
Mitchell's shed and killed Al (Tr. 354-55).

• At the close of all evidence Joe moved for judgment of
acquittal which was denied (Tr. 356).

• Under the theory of the case the prosecution had to prove
the elements of Robbery 1st, as set forth in §569.020 RSMo.
that Joe:

   (1) Forcibly stole property; and

   (2) In the course thereof caused serious physical injury to Al.

• The prosecution, to prove Joe guilty of ACA had to prove
the elements, as set forth in §571.015 RSMo. that Joe:

   (1) Committed the felony of Robbery 1st; and

   (2) did so; by, with, or through the use, assistance or aid
   of a dangerous instrument.

• The trial court found Joe guilty of Robbery 1st and ACA as
charged in Counts 4 and 6 (Tr. 404-05).

15

* Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(3) Did you receive a hearing on your motion or petition?

    Yes ☐  No ☐

(4) Did you appeal from the denial of your motion or petition?

    Yes ☐  No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

    Yes ☐  No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: Ground raised on Direct Appeal _____

_____

_____

(e) Other Remedies: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One: _____

_____

GROUND TWO: Insufficient evidence for Murder 1st and ACA convictions; (Due Process clause, 5th and 14th Amend., U.S. Constitution)

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): See Additional pages _____

_____

_____

_____

Additional page ONE for GROUND TWO 12.(a)

## Supporting Facts

· On January 28, 2010 Petitioner (Harden) was charged in Count
1 of an Amended Information, that he: "in violation of Section
565.020 RSMo., committed the class A felony of murder in the
first degree, punishable upon conviction under Section 558.011.1.
RSMo., in that on or about July 8, 2008, in the County of Pemiscot,
State of Missouri, the defendant, after deliberation, knowingly
caused the death of Albert Lynn Harper by striking and stabbing
him."; and     in Count 3, that he: "in violation of Section
571.015 RSMo., committed the felony of armed criminal action,
punishable upon conviction under Section 571.015 RSMo., in that
on or about July 8, 2008, in the County of Pemiscot, State of
Missouri , the defendant committed the felony of murder in the
first degree charged in Count I, all allegations of which are
incorporated herein by reference, and the defendant committed
the foregoing felony of murder in the first degree by, with
and knowingly through the use , assistance and aid of a dangeroous
instrument, to-wit: a concrete block." Legal File on Direct
Appeal (L.F. SD30479) at 57-58

Additional page TWO for GROUND TWO 12.(a)


· On July 7, 2008 Danny Singletary, who lived in Dyersburg, Tennessee called Joe Harden for a ride to Al Harper's house in Paragould, Missouri (Tr. 44-47). Joe and his wife drove to Dyersburg on July 7th, picked up Danny, and drove him to Al's house in Paragould (Tr. 47-48). Danny, Al, and Joe went to an ATM machine; Al took out $200 and gave Joe $70 for bringing Danny to Paragould (Tr. 49, 55-56). Joe and his wife then drove to Kennett, Missouri (Tr. 48).

· Later that evening Danny called and asked Joe for a ride back to Dyersburg to pick up more clothes and drugs (Tr. 48-50, 56). Joe and his wife drove back to Paragould to get Danny (Tr. 50). After a stop in Kennett Danny, Al, and Joe headed to Dyersburg (Tr. 50-52). Danny was driving and all of them had been drinking and using drugs (Tr. 52-54). Just before reaching Hayti, Missouri Danny tried to pass a truck and ended up off the road and in the grass with the front and rear tires blown out on the driver's side (Tr. 54). Danny was trying to get over the median to the right side of the road when he was stopped by Hayti police officer Brad Jones and arrested for driving while intoxicated (Tr. 54, 72-73). The stop occurred at about 3:30 a.m. near Highway 84 in front of the First State Bank (Tr. 72-73).

· Officer Jones' trial testimony was that Joe was wearing a

2

Additional page THREE for GROUND TWO 12.(a)


sleeveless T-shirt, black jeans, a red baseball-type cap and a
pair of boots - not flip flops (Tr. 74-76; StEx-7). Joe's
booking photo depicted the way Joe appeared on July 8th at his
arrest and how his hair was at the time of the arrest (Tr. 84,
227, 264-65; DefEx-B). Officer Jones did a pat down search of
Joe and found a pocket knife (Tr. 77). Al Harper was wearing
a white T-shirt with sleeves, blue jeans, sandals and a
camouflaged hat (Tr. 74-76; StEx-7).


· At approximately 4:00 a.m., after the car had been searched
and they had been searched, Joe and Al were released (Tr. 73-
75). When Jones left to take Danny to the police station Al and
Joe were at or near First State Bank's ATM machine (Tr. 75).
Officer Jones did not observe any animosity between Joe and Al -
Both were alive, well, and getting along (Tr. 83). Two ATM cash
withdrawals on July 8th, one at 4:23 a.m. and the other at 4:25
a.m., were documented on videotape and in bank records (Tr. 89-
92; StEx's 8 and 9). The first withdrawal was for $20 and the
second was for $200 (tr. 90).


· At about 5:30 a.m. on July 8th Chakita Johnson drove past
Brown's Grocery en route to pick up her brother to take him
to work (Tr. 95). She saw two men, one on the pay phone and one
sitting down (Tr. 95-96). After taking her brother to work, she

3

Additional page FOUR for GROUND TWO 12.(a)

returned home and again passed Brown's Grocery; this time both
men were sitting down (Tr. 95). The two men were white (Tr. 95).
One was skinny and the other was a little chubby (Tr. 96). They
were close to the store, near the trash can and pay phone (Tr.
97). They appeared to be waiting for someone (Tr. 97).

· Between 7:00 and 7:30 a.m. Bruce Sams was driving westbound on
Highway 84 en route to work (Tr. 99). As he passed Neely's shop
building Sams saw a white male wearing a ball cap and blue jeans
cut off at the knees coming out from Mr. Neely's shop (Tr. 99-
100, 103-04). He appeared to be walking towards old 84 (Tr. 100-
01). The man was shirtless and had tattoos on his chest and arms
(Tr. 100-01). Sams thought it looked like he had two caps on,
one forwards and one backwards - like an old trucker hat (Tr.
100-01). The man wasn't carrying anything (Tr. 102). He was
stocky but not overweight and in his late 30's to early 40's
(Tr. 105).

· Neely Mitchell's farm shop is at 50 West State Highway 84
just west of Hayti Heights and about 250-300- yards from Brown's
Grocery (Tr. 106-07). At about 7:15 a.m. on July 8th Neely
Mitchell was driving west on Highway 84 and saw a white male
walking east on the north side of 84 highway carrying something
in one of his hands (Tr. 107, 110-11). When Mitchell saw him

4

Additional page FIVE for GROUND TWO 12.(a)

the man was 25 to 30 feet west of the drive to Brown's Store (Tr. 108). The man wore bluejeans and was shirtless (Tr. 108). Mitchell noticed the man's hair was visible on the neck and he had letters approximately an inch high tattooed across the upper part of his back (Tr. 108-09). [Danny Singletary testified that Joe has some kind of tattoos on his shoulders and his name "Harden" tattooed across his back (Tr. 46)] The man was just right across the road that runs on the west side of Brown's (Tr. 114-15; DefEx-A). On cross-examination Mitchell acknowledged that he had told the prosecutor that this man had long stringy hair (Tr. 115). The man was not wearing a hat (Tr. 118). Mitchell acknowledged that he could not identify the man he saw (Tr. 118).

· Mitchell arrived at his shop, got out of his truck, and let his dog out (Tr. 111). He walked to the rear north side of his shop and saw a man, apparently dead, lying face up with a white T-shirt covering his head and face and a ladder, chained to the shop, partially over him (Tr. 111-12; StEx-11). In the area of the body there were variously-sized rock-type remnants of the foundations of demolished former tenant dwellings (Tr. 119). Mitchell called the Sheriff; his phone records indicate that he made that call at 7:40 a.m. (Tr. 117; DefEx-C). Almost simultaneously Deputy Joe Bryant drove past the shop and Mitchell

5

Additional page SIX for GROUND TWO 12.(a)

waved at him (Tr. 112, 118, 127-29). Seconds later Bryant
received a call concerning the dead body at Mitchell's shop
and went there (Tr. 128). Bryant was then much closer to Brown's
Grocery and did not see anyone at Brown's or in the vicinity
(Tr. 138-39).

· On the west side of Mitchell's shed, which was visible from
the roadway, Bryant found an accumulaiton of blood and drag
marks indicating that someone had been dragged from that spot
to the rear of the building out of view of the road (Tr. 139-
40)

· Chief Sheckell testified that Joe became a suspect because
he was in the car with Al and Danny when the car was stopped
(Tr. 147). Joe's father and brother called and asked Sheckell
why the police were looking for Joe, and eventually Joe called
and spoke to Sheckell (Tr. 147-48). Joe said he had done nothing
wrong; that he had been helping a black lady - didn't know her
name - move a television set that morning and that she had
given him a ride to Kennett (Tr. 149). Joe also said that he
and Al had gone to the bank; Al withdrew some money from the ATM,
gave Joe $100 and then they seperated (Tr. 153-54).

· Bryant testified that it is approximately a mile from First

Additional page SEVEN for GROUND TWO 12.(a)

State Bank to Brown's Grocery and a few hundred yards from
Brown's to Mitchell's shop (Tr. 130). He estimated that Elinore
Booth's home on North Walnut Street is about a half mile from
Brown's Grocery (Tr. 130-31). On a lot adjacent to Booth's home
under a concrete porch Bryant found a camouflage baseball hat
and a white sleeveless T-shirt (Tr. 131-136; StEx's 31, 32, 35,
and 36).

· On July 8, 2008 Lt. Ryan Holder and Mo. State Hwy. Ptrl. Sgt.
Stoelting interviewed Joe at the Kennett Police Department (Tr.
227-28) They made no attempt to record any part of the interview
(Tr. 228, 258). According to Stoelting, in response to questions
that he and Holder asked, Joe said that he did not know where Al
was - he last saw Al walking west from Brown's Grocery (Tr. 239).
Al got $200 from the ATM and gave Joe $75 (Tr. 239). They walked
together to Brown's Grocery and Joe used Al's phone card to call
his wife and also to call a friend, Mr. Turner, for a ride (Tr.
240-41). After waiting for Turner, who never came, Joe began
walking towards Kennett (Tr. 241). On Pascola Road he helped
a black woman and man load a TV into their car, then rode with
them to another house to unload it (Tr. 241). Joe asked the
woman if he could pay her for a ride to Kennett; she said she
was going anyway and would take him (Tr. 242). He offered her
$40 and gave her $15 (Tr. 242). After pumping gas for her in

7

Additional page EIGHT for GROUND TWO 12.(a)


Kennett near Walmart he called his brother from the Dairy
Queen (Tr. 243). Joe's brother took Joe to Paragould so Joe could
get his wife and then back to Kennett; Joe was arrested after
returning to Kennett (Tr. 243-45).

· According to Stoelting Joe at first denied going into Walmart
but eventually said he bought jeans, a shirt, and shoes at Walmart
and gave the pants to a Walmart employee to throw away because
they were sweaty or nasty (Tr. 247-52). When Stoelting accused
Joe of lying Joe said he did not kill Al and wanted an attorney
(Tr. 252). At some point before this Joe agreed to give a
buccal swab (Tr. 254-55). Later Joe said that if he could have
a cigarette he would think about telling Stoelting what happened
(Tr. 253). Joe got a cigarette then said that earlier in the
evening Al and Danny had gotten into a fight and Joe got blood
on his jeans breaking up the fight (Tr. 253).

· Sheckell's investigation led him to Elinore Booth and her son
Donald (Tr. 149050). Sheckell spoke to Donald who said that
the white guy had put a shirt and a hat under some steps on the
vacant lot next to their house (Tr. 151). Sheckell and Bryant
found a baseball hat and a T-shirt in a lot next to the Booth
house and Bryant seized these items (Tr. 146, 151; StEx's 35
and 36).

8

Additional page NINE for GROUND TWO 12.(a)


• Elinore Booth testified that she and her son were picking up
a TV that the owner had put out to be recycled when a white man
came up and spoke to her about someone they both knew (Tr. 163-
65). The man helped her load the TV and offered to pay her to
take him to Kennett (Tr. 165). Ms. Booth told him she was
planning to go to Kennett but he paid some (Tr. 165). Before
going to Kennett Ms Booth stopped at her house to unload the TV
(Tr. 166). Ms. Booth and the white man then drove to Kennett
(Tr. 170-71). Ms. Booth stopped to get gas; she paid for it and
the white man pumped it for her (Tr. 166-67). She let the man
out in front of the Kennett Walmart store (Tr. 167).


• Donald Booth testified that when they got to his mother's
house to unload the TV the man threw the clothes down in the
porch in the lot next door (Tr. 173-74).


˚ After leaving Ms. Booth Joe went to Walmart (Tr. 186, 188).
As Joe was walking into the store Walmart employee Tim Fortune
noticed that Joe did not have a shirt on (Tr. 186). Fortune saw
Joe again when he came out of the fitting room; Joe bought a
pair of pants, a belt, a shirt and a pair of shoes (Tr. 186-87).
Joe said he got gas soaked working on his vehicle (Tr. 187).
At the register Joe gave Fortune his old pants to throw away
(Tr. 187-88). Surveillance tapes from the Kennett Walmart showed

Additional page TEN for GROUND TWO 12.(a)

Joe entering and shopping at the store (Tr. 196-99). The pants that Joe had given to Fortune to throw away were stained with blood and were recovered (Tr. 201-02).

· Investigators working on the case found a black leather wallet belonging to Al in a trash can outside of Brown's Grocery near a phone up against the store building (Tr. 222, 260-61). The wallet had Harper's debit/credit card and some personal items; it did not contain any money (Tr. 222-26). On July 11, 2008, after Joe had been arrested and confined investigators found a knife midway between Brown's Grocery and Mitchell's shop (Tr. 219-21, 226-27).

· Diane Higgins, a forensic scientist at the Missouri State Highway Patrol Crime Lab, tested the evidence seized. Higgins' testing showed that the blood on a concrete block seized at Mitchell's farm, the stains on Joe's jeans, and the stain on the sleeveless T-shirt were all consistent with Al Harper's blood (Tr. 277-78). Blood on the blade of the black knife seized from the roadside between Mitchell's farm and Brown's Grocery produced a partial DNA profile consistent with Al Harper (Tr. 280-81, 296). [Danny testified that he was at Reelfoot Lake with Joe and his wife a week or two before Al was killed and that Joe had a knife then (Tr. 56-57). Joe also had a knife at Al's

10

Additional page ELEVEN for GROUND TWO 12.(a)

house that he pulled out when they were making sandwiches (Tr. 57-58). Danny identified StEx-6 as a picture of the knife (Tr. 58; StEx-6)]. Higgins' testing of the inside of the sleeveless T-shirt (tank top) showed a mix of the DNA of at least two individuals; Joe and Al could not be excluded as contributors to this mix (Tr. 281-82). Al could not be excluded as the source of the DNA on the inside of the camouflage cap (Tr. 283-84). There was insufficient DNA on the handle of the black knife for DNA testing, although testing of the knife handle revealed alleles that did not match Joe's DNA profile (Tr. 284-85, 298). There were no fingerprints on the wallet found at Brown's Grocery (Tr. 284-85). Higgins testified that DNA from one person will transfer to another person by physical contact; Squeezing someone's hand or pulling up a pair of pants could transfer DNA to another person's hand or to the pants (Tr. 303).

· A report of the autopsy performed by Dr. Zaricor and the accompanying lab report were admitted into evidence by stipulation (Tr. 21-23). According to the report the time of death was 7:30 a.m. and the cause of death was primarily massive blunt trauma which crushed Al's head and face. Knife wounds to Al's neck were inflicted while he was still-alive; stab wounds on his chest appear to be post-mortem. Lab analysis found measurabale amounts of Diazepam, Nordiazepam, Cocaine and Tramadol in Al's

/l

Additional page TWELVE for GROUND TWO 12.(a)


blood. Dr. Zaricor wrote that at death Al was grossly intoxicated
and potentially stuperous with toxic levels of cocaine, alcohol
and Tramadol in his body (SrEx-5).

· At the close of the State's case Joe moved for a judgment of
acquittal on all counts which the trial court overruled (Tr. 304-
06; L.F. 62-62).

· Gene Turner testified on deposition that Joe called the Turner
house on July 8 at about 5:45 a.m. (Turner Deposition (Depo.) 5).
[The deposition of witness Gene Turner was admitted into evidence
in lieu of live testimony (Tr. 23, 306; DefEx-E)]. Joe said he
was in front of Brown's Grocery with another guy and wanted to
go to Kennett (Turner Depo. 7-8). He told Gene he had alot of
money and might ask Turner to take him to Paragould (Turner
Depo. 8-9). Both Turner and his wife, who first spoke to Joe,
told Joe that Gene had an early appointment with the eye doctor
and would not have time to go get Joe (Turner Depo. 6-9). Joe
persisted and Gene said that if he had time he would pick up
Joe, but if Gene did not get to the store by 6:15 a.m. he wasn't
coming (Turner Depo. 10). Joe thanked Gene and hung up; Gene was
running late and never went to Brown's (Turner Depo. 10).

· Joe Harden testified in his own defense at trial; After being

12

Additional page THIRTEEN for GROUND TWO 12.(a)

stopped in Hayti he and Al went to the ATM (Tr. 314-16). Al
tried to take out $200 and got $20; Joe helped him get $200 and
Al gave Joe $75 for bringing Danny to Dyersburg (Tr. 316). While
the car was being loaded onto the tow truck Joe put his boots
into the car and got his flip flops (Tr. 317). Al and Joe then
began walking (Tr. 317). When they reached the railroad tracks
at the beginning of Hayti Heights Al (who had downed some pre-
scription medication when the car was pulled over) fell down face
first and rolled into a ditch busting his nose and mouth (Tr. 317-
18). Joe sat down to pull Al out of the ditch and in doing so
Joe got blood on his pants (Tr. 318).

· Joe and Al got to Brown's and stopped. Al's shirt was bloody
from his fall; Joe gave his shirt to Al to wipe his face (Tr.
318). Using Al's phone card Joe called his wife and then called
a family friend, Gene Turner, for a ride (Tr. 319-20). Gene
agreed to come so Al and Joe waited; eventually it became appar-
ent that Gene was not coming (Tr. 319). Joe saw a woman loading
a TV into a truck (Tr. 321). Telling Al to wait Joe wnt to help
and see if he could get a ride if he offered her some money (Tr.
321-22). That was the last Joe saw of Al (Tr. 322). After the TV
was loaded on the truck the woman drove to her home and the TV
was unloaded (Tr. 322). The woman gave Joe a ride to Kennett;
they passed Brown's Grocery and Al was not there (Tr. 322). Al

13

Additional page FOURTEEN for GROUND TWO 12.(a)


still had Joe's shirt when Joe went to help load the TV onto the truck (Tr. 323). Joe did not have any arguments with Al - both he and Al were trying to help Danny (Tr. 323).


· In Kennett Joe pumped gas for Ms. Booth and offered her $20 (Tr. 323-24). Joe called his brother from Walmart and while waiting for his brother Joe bought shoes, blue jeans and a shirt (Tr. 324).


· From his father Joe subsequently learned that the Hayti police were looking for him (Tr. 325). Joe called Chief Sheckell; Sheckell would not tell Joe what was going on - just that he would pick up Joe (Tr. 325-26). Joe and his wife went to a friend's house where Joe again called Sheckell (Tr. 327). While Joe was talking to Sheckell Holder and Stoelting arrived and took him to the police station (Tr 328).


· Holder and Stoelting asked Joe stupid questions such as whether Al made homosexual advances; and Joe responded with stupid answers (Tr. 329, 331). In response Joe told the police that he had not harmed or killed Al and that Al fell and busted his face (Tr. 329-30). Joe said he had no quarral with Al and that Al had paid him as agreed (Tr. 333). Joe testified that he did not take any thing from Al or try to rob him; that there was not enough time

14

Additional page FIFTEEN for GROUND TWO 12.(a)

to kill someone, move a TV set and get to Kennett all in 32
minutes (Tr. 333-34). Joe was sorry that he gave stupid answers
to Stoelting's questions (Tr. 334). Joe denied that he went to
Mitchell's shed and killed Al (Tr. 354-55).

· At the close of all evidence Joe moved for judgment of
acquittal which was denied (Tr. 356).

· Under the theory of the case the prosecution had to prove
the elements of Murder 1st, as set forth in §565.020 RSMo. that
Joe:

   (1) Knowingly caused the death of Al; and
   (2) did so; After deliberation upon the matter.

· The prosecution, to prove Joe guilty of ACA had to prove
the elements, as set forth in §571.015 RSMo. that Joe:

   (1) Committed the felony of Murder 1st; and
   (2) did so; by, with, or through the use, assistance or aid
   of a dangerous instrument.

· The trial court found Joe guilty of Murder 1st and ACA as
charged in Counts 1 and 3 (Tr. 404-05).

15

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Two, explain why: _____

_____

_____

_____

(c) **Direct Appeal of Ground Two:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

       Yes ☒   No ☐

    (2) If you did <u>not</u> raise this issue in your direct appeal, explain why: _____

_____

_____

(d) **Post-Conviction Proceedings:**

    (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a

    state trial court?

       Yes ☐   No ☒

    (2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

    (3) Did you receive a hearing on your motion or petition?

       Yes ☐   No ☐

    (4) Did you appeal from the denial of your motion or petition?

       Yes ☐   No ☐

    (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

       Yes ☐   No ☐

    (6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this
issue: ___Ground raised on Direct Appeal_____

_____

_____

_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative
remedies, etc.) that you have used to exhaust your state remedies on Ground Two: _____

_____

_____

_____

GROUND THREE: Ineffective assistance of counsel (6th Amendment, U.S. Const.)

(a) Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):
See Additional Pages

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____

_____

_____

(c) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ❑ No ☒

(2) If you did not raise this issue in your direct appeal, explain why: This issue was raised
in post-conviction action.

_____

Additional page ONE for GROUND THREE 12.(a)

## Supporting Facts

·Trial counsel were ineffective for failing to file a motion to dismiss the first-degree murder, first-degree robbery, and armed criminal action charges or dismiss the State's notice of death based on grounds of prosecutorial vindictiveness.

· Harden chose to have a preliminary hearing (L.F. 2) and wanted to go to trial rather than accept a plea offer from the State (Beth Ann Davis-Kerry Depo. 11-12).

· At Harden's preliminary hearing there were no additional facts or aggravators presented warranting the death penalty (Beth Ann Davis-Kerry Depo. 11-12).

· Fifteen days after Harden's preliminary hearing the State filed a notice to seek the death penalty (L.F. 5).

· At the time the State filed the notice of death there was no reason. given by the State for doing so (Brandon Sanchez Depo. 7).

· The notice of death was sought solely to punish Harden for exercising his right to trial or to force Harden to give up his right to a jury trial in order to have death waived by

Additional page TWO for GROUND THREE 12.(a)

the State.

· Despite counsel being aware of Harden's belief that the State's notice of death was filed vindictively because of Harden's rejection of the State's plea offer (Beth Ann Davis-Kerry Depo. 12) neither of Harden's trial counsel made him aware that a motion to dismiss the State's notice of death because of vindictiveness could be filed (Beth Ann Davis-Kerry Depo. 10; Robert Wolfrum Depo. 11; Joseph Wayne Harden Depo. 8).

· Harden waived his right to a jury trial in order for the State to withdraw the death penalty (L.F. 38).

· If not for the State seeking the death penalty Harden would have stood on his right to a jury trial (Joseph Wayne Harden Depo. 8).

· The objective data with all of the cases that trial counsel had handled with prosecutor Hazel in the past, resulted in Hazel backing off of the death penalty and coming up with a non-death penalty sentence in negotiations (Beth Ann Davis-Kerry Depo. 12-13).

· The timing of the State's filing of the notice of death,

2

Additional page THREE for GROUND THREE 12.(a)


combined with Harden's refusal to plead, indicated that the
State was penalizing Harden for insisting on a jury trial.
Nothing in the record suggested that non-vindictive reasons,
such as new evidence about the crime, Harden, or the crime's
impact, underlay notice of intent to seek the death penalty.
Rather, everything suggested that the State vindictively filed
the notice of death to encourage Harden to waive his jury trial
and deter him from proceeding to trial.

· But for counsel's failure there is a reasonable probability
that the trial court would have dismissed the State's indictment.

**(d) Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a

state trial court?          Yes ☒  No ☐

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _Post-conviction Motion under Mo. Rule 29.15_

Name and location of the court where the motion or petition was filed: _Circuit Court of Pemiscot_
_County, Missouri, 610 Ward Ave., P.O. Box 34, Caruthersville, MO 63830._

Docket or case number (if you know): _11PE-CC00565_

Date of the court's decision: _August 30, 2012_

Result (attach a copy of the court's opinion or order, if available): _Motion overruled._

_____

(3) Did you receive a hearing on your motion or petition?

   Yes ☒  No ☐

(4) Did you appeal from the denial of your motion or petition?

   Yes ☒  No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

   Yes ☒  No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _Missouri Court of Appeals,_
_Southern District, 300 Hammons Pkwy., Springfield, MO 65806._

Docket or case number (if you know): _SD32315_

Date of the court's decision: _November 12, 2013_

Result (attach a copy of the court's opinion or order, if available): _Judgment affirmed._

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this
issue: _____

_____

_____

**(e) Other Remedies:** Describe any other procedures (such as habeas corpus, administrative

remedies, etc.) that you have used to exhaust your state remedies on Ground Three: _____

_____

_____

GROUND FOUR: Ineffective assistance of counsel (6th Amendment, U.S. Const.)

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):
See additional pages.

(b) If you did not exhaust your state remedies on Ground Four, explain why: _____

(c) **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐  No ☒

(2) If you did **not** raise this issue in your direct appeal, explain why: This issue was raised
in post-conviction action.

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a

state trial court?          Yes ☒  No ☐

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: Post-conviction Motion under Mo. Rule 29.15

Name and location of the court where the motion or petition was filed: Circuit Court of Pemiscot
County, Missouri, 610 Ward Ave., P.O. Box 34, Caruthersville, MO 63830.

Docket or case number (if you know): 11PE-C000565

Date of the court's decision: August 30, 2012

Result (attach a copy of the court's opinion or order, if available): Motion overruled.

(3) Did you receive a hearing on your motion or petition?

Yes ☒  No ☐

(4) Did you appeal from the denial of your motion or petition?

Yes ☒  No ☐

Additional page ONE for GROUND FOUR 12.(a)

· Trial counsel was ineffective for failing to request that
the trial court strike Donald Booth's testimony.

· During the preliminary hearing Booth testified that he was
not paying attention and did not see Harden go over and place
something under the bottom part of the porch. Booth only testified
that he saw a red handkerchief under the porch (Prelim. Hrg.
Tr. 46).

· At trial Booth never testified that he saw Harden place a
shirt and hat underneath part of a foundation on a neighboring
vacant lot (Trial Tr. 173-174). The trial court asked Booth
about the shirt and hat and Booth stated that he never told
the police that he saw Harden place the shirt and hat under
the porch (Trial Tr. 178).

· Had trial counsel requested the trial court to strike Booth's
testimony there would have been no evidence linking Harden
to the shirt and hat.

· Trial counsel Robert Wolfrum remembered witness Booth (Robert
Wolfrum Depo. 13). Booth won an award from the Hayti, Missouri
police Dept. (Wolfrum Depo. 15). As an advocate Wolfrum took
the position that Booth was unreliable because of the inconsis-
tencies and perhaps because he was trying to please the authorities

\

Additional page TWO for GROUND FOUR 12.(a)


(Wolfrum Depo. 16). Wolfrum was aware of Booth's inconsistent
testimony from the preliminary hearing and trial (Wolfrum Depo.
14-15). Wolfrum did not seek to strike Booth's testimony because
he did not think that was a possible remedy (Wolfrum Depo.
15, 33). Wolfrum thought the proper remedy for a prior inconsistent
statement was that either party could bring out the prior
inconsistent statements as evidence (Wolfrum Depo. 15, 31-32).
Wolfrum requested and the trial court took judicial notice
of Booth's preliminary hearing testimony. (Wolfrum Depo. 30).
Wolfrum recalled that trial Judge Copeland basically acknowledged
that there were inconsistencies between Booth's two statements
(Wolfrum Depo. 30).


· Trial counsel Beth Ann Davis-Kerry  remembered witness Donald
booth (Beth Ann Davis-Kerry Depo. 14). Booth seemed to have
some developmental disabilities (Davis-Kerry Depo. 16-17).
Davis-Kerry considered Booth an important witness for the State
because he ultimately testified that he told police that he
saw Harden hiding what turned out to be evidence (Davis-Kerry
Depo. 15). Davis-Kerry recalled that Booth never said anything
about seeing Harden stuff some things under a rock, set of

steps, or a foundation of a house until the trial (Davis-
Kerry Depo. 15). Booth could not recall what he said during
the preliminary hearing (Davis-Kerry Depo. 16). Davis-Kerry

2

Additional page THREE for GROUND FOUR 12.(a)


did not consider the impeachment of Booth "clean" (Davis-Kerry
Depo. 21). She thought it was pretty evident in the courtroom
that Booth certainly made a statement at trial different than
what his original statement at the preliminary hearing was
(Davis-Kerry Depo. 21). She thought it was also evident that
Booth might have some memory and cognitive problems in his
ability to remember and recall accurately (Davis-Kerry Depo.
21). Davis-Kerry does not recall whether she and Wolfrum considered
striking Booth's testimony. Their position was that they could
argue and the judge was going to be able to divine that Booth
was not a reliable witness (Davis-Kerry Depo. 16, 17).

· By failing to strike Booth's testimony trial counsel acted
unreasonably because Booth never testified that he saw Harden
place the hat and shirt under the porch. Without Booth's testimony
there was no direct link connecting Harden to the shirt and
hat.

· Reasonably competent trial counsel under the same or similar
circumstances would have requested to strike Booth's testimony
based on his previous preliminary hearing testimony as well
as his trial testimony.

· But for trial counsel's failure there is a reasonable probability

3

Additional page FOUR for GROUND FOUR 12.(a)


that Booth's testimony would have been struck and the outcome

of Harden's trial would have been different.

4

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes ☒ No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: Missouri Court of Appeals,
Southern District, 300 Hammons Pkwy., Springfield, MO 65806.

Docket or case number (if you know): SD32315

Date of the court's decision: November 12, 2013

Result (attach a copy of the court's opinion or order, if available): Judgment affirmed.

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this
issue: _____

_____

(e) Other Remedies: Describe any other procedures (such as habeas corpus, administrative
remedies, etc.) that you have used to exhaust your state remedies on Ground Four: _____

_____

_____

13. Please answer these additional questions about the petition you are filing:

(a) Have all grounds for relief that you have raised in this petition been presented to the highest
state court having jurisdiction?        Yes ☐ No ☒

If your answer is "No," state which grounds have not been so presented and give your
reason(s) for not presenting them: Grounds Three and Four were not presented
to the Mo. S. Ct. because transfer to that Court is an extraordinary
remedy that is not required for exhaustion of Federal Habeas Corpus
claims. Mo. Rule 83.04; and Randolph v. Kemna, Id. at 404.

(b) Is there any ground in this petition that has not been presented in some state or federal
court? If so, which ground or grounds have not been presented, and state your reasons for
not presenting them: _____

_____

14. Have you previously filed any type of petition, application, or motion in a federal court regarding
the conviction that you challenge in this petition?        Yes ☐ No ☒

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court opinion or order, if available. _____

_____

_____

_____

_____

_____

15. Do you have any petition or appeal <u>now pending</u> (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?    Yes ☐    No ☒

    If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. _____

    _____

    _____

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

    (a) At preliminary hearing: Brandon Sanchez, 407 Walker Ave., Caruthersville, MO 63830

    (b) At arraignment and plea: Brandon Sanchez, 407 Walker Ave., Caruthersville, MO 63830

    (c) At trial: Robert Wolfrum, 1010 Market St., Suite 1100, St. Louis, MO 63101

    (d) At sentencing: Robert Wolfrum, 1010 Market St., Suite 1100, St. Louis, MO 63101

    (e) On appeal: Deborah B. Wafer, 1010 Market St., Suite 1100, St. Louis, MO 63101

    (f) In any post-conviction proceeding: Timothy Forneris, 1010 Market St., Suite 1100, St. Louis, MO 63101

    (g) On appeal from any ruling against you in a post-conviction proceeding: Timothy Forneris, 1010 Market St., Suite 1100, St. Louis, MO 63101

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?        Yes ☐   No ☒

(a) If so, give name and location of court that imposed the other sentence you will serve in the future: _____

_____

(b) Give the date the other sentence was imposed: _____

(c) Give the length of the other sentence: _____

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?     Yes ❑  No ❑

18. TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.* _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

---

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1) A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of —

(continued...)

Therefore, petitioner asks that the Court grant the following relief: Issue a writ of Habeas Corpus relieving Petitioner of his unconstitutional convictions and sentences; and to grant such other relief as may be appropriate.

or any other relief to which petitioner may be entitled.

NA

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on Feb.24, 2014 _____ (month, date, year).

Executed (signed) on Feb.24, 2014 (date).

Joseph Harder

Signature of Petitioner

Joseph Harden #286322
South Central Correctional Center
255 W. Hwy. 32
Licking, MO 65542-9069

---

*(...continued)

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

## CERTIFICATE OF INSTITUTIONAL MAILING

I hereby certify that a copy of the foregoing was mailed, via U.S. Mail, with first-class postage prepaid, to: Office of the Clerk, U.S. District Court, Eastern District of Missouri, 111 S. 10th St., Ste. #3.300, St. Louis, MO 63102 by being deposited in the Institutional Mailbox at: South Central Correctional Center, 255 W. Hwy. 32, Licking, MO 65542-9069.

Executed On: 2/24/2014 Signed: Joseph Harden

Joseph Harden #286322
SCCC, 255 W. Hwy. 32
Licking, MO 65542-9069