# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH HARDEN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4:14-CV-383 NAB |
| | ) | |
| MICHAEL BOWERSOX, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM AND ORDER

This action is before the Court on Petitioner Joseph Harden's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. [Doc. 1.] Respondent Michael Bowersox filed a response to the Petition for Writ of Habeas Corpus. [Doc. 7.] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). [Doc. 8.] For the reasons set forth below, Harden's petition for writ of habeas corpus will be granted in part and denied in part.

## I.      Background

After a bench trial, Harden was convicted of first degree murder, first degree robbery, and two counts of armed criminal action. (Resp't Ex. A at 67-69.) He was sentenced to concurrent terms of life imprisonment for the murder and robbery counts. *Id.* He was further sentenced to concurrent terms of ten years for the armed criminal action counts, to run consecutive to his life

sentence. *Id.* The following evidence, in the light most favorable to the verdict, was presented at trial.[1]

On July 7, 2008, a man named Al Harper (Al) paid Harden $70 to drive to Dyersburg, Tennessee to pick up a friend named Danny Singletary (Danny) and bring him back to Al's house in Paragould, Arkansas. Al had invited Danny to stay with him for a week or two. Danny knew Harden because he had married Danny's sister-in-law. Harden's name is tattooed in large letters across Harden's back and shoulders. While Harden was at Al's house, Danny saw Harden pull out a three-inch knife with a black handle while they were making sandwiches. Harden returned home to Kennett, Missouri. Later that night, after receiving a telephone call from Danny, Harden returned to Paragould. Al, Danny and Harden eventually drove together from Paragould to Dyersburg in order to "get more clothes and drugs." Danny was driving. At that point, all three men had been drinking and using crack cocaine.

The men were traveling through Hayti, Missouri at about 3:30 a.m. on July 8th when Danny ran the car off the road while attempting to pass a semi-truck. Despite blowing out both tires on the driver's side of the car, Danny managed to get the vehicle back on the road before being pulled over by Officer Jones, a Hayti police officer. Danny was arrested for driving while intoxicated. Officer Jones did a pat down search of Harden and found a pocket knife, but the knife posed no threat to the officer. Officer Jones' report did not indicate that the pocket knife was taken from Harden. Officer Jones observed that Harden was wearing a white sleeveless t-shirt, black jeans, a red baseball cap and boots. Al was wearing a camouflaged hat, a white t-

---

[1] These facts are taken directly from the Supplemental Memorandum accompanying the Missouri Court of Appeals decision in Harden's direct appeal. (Resp't Ex. G.) A state court's determination of a factual issue shall be presumed to be correct. 28 U.S.C. § 2254.

shirt with sleeves, blue jeans and sandals. At about 4 a.m. Harden and Al were released by Officer Jones.

Harden and Al then walked to an ATM at a bank near the location where Officer Jones had stopped their vehicle. Bank records showed that Al's debit card was used to make two separate withdrawals, for $20 and $200, at 4:23 a.m. and 4:25 a.m. An ATM surveillance video showed Al making the withdrawals and giving Harden some of the cash. At about 5:45 a.m., Harden called a friend from a pay phone at Brown's Grocery and asked him to pick Harden up and take him to Kennett. The friend was not able to do so because he had a doctor's appointment. Around this time, a motorist driving past Brown's Grocery saw two men, one on the phone and the other sitting down.

Between 7:00 a.m. and 7:30 a.m., two passing motorists saw a shirtless man wearing· jeans walking along the highway near a farm shop that was about 250 to 300 yards from Brown's Grocery. One of the motorists observed that this person was "coming out from" the farm shop. The other motorist, who was the owner of the farm shop, noticed approximately inch-tall letters tattooed across the upper part of this person's back. He also noticed this person carrying something in one of his hands.

When the farm shop owner arrived at his business, he walked out behind his shop and found Al. He was lying on the ground face up and appeared dead. There was a white t-shirt covering his head and face. The shop owner immediately called the sheriff's department, and a deputy soon arrived at the scene. On the west side of the shop at an area visible from the road, the deputy found blood and drag marks indicating that someone had been dragged from that spot to a location behind the building that could not be seen from the road.

Al's head and face had been crushed with some sort of blunt object. In a field behind the shop, police recovered a large concrete block with blood on it. Forensic testing showed that the blood stains on the block were consistent with Al's DNA. The autopsy report stated that Al's death was a homicide, and the primary cause of death was massive blunt trauma to the head. Al's neck and throat had been slashed multiple times, and he had 36 stab wounds to his chest. Al's throat had been cut while he was alive, but the stab wounds to his chest appeared to have been inflicted post-mortem. The report also stated that Al was "grossly intoxicated and potentially stuperous" at the time he was killed.

Sometime after 7:30 a.m., Harden was seen in a neighborhood about one-half mile from the farm shop where a woman and her son, Donald Booth, were trying to load an abandoned television on the roadside into their truck. Harden helped the pair load the television and then unload it at the woman's house. Booth saw Harden throw a t-shirt and a hat underneath some steps on an adjacent vacant lot. Police later recovered a white sleeveless t-shirt and a camouflaged baseball cap from that lot. Forensic tests showed that the mixture of DNA on the t-shirt was consistent with the DNA profiles of both Harden and Al. DNA found inside the hat was consistent with Al's DNA profile.

After the television was unloaded, the woman drove Harden to Kennett. She dropped Harden off at a Wal-Mart. He entered the store shirtless at 8:25 a.m. When a Wal-Mart employee asked Harden why he had no shirt, Harden said he had been soaked with gasoline while working on his vehicle. Harden purchased a pair of pants, a belt, a shirt and a pair of shoes. He told the employee to throw away his old jeans for him. Police later recovered the jeans, and DNA testing revealed that the large blood stains covering the jeans were consistent

with Al's DNA.  In addition, a mixture of Harden's DNA and Al's DNA was found on the inside of the waistband of Harden's jeans.

Law enforcement officers discovered Al's black leather wallet inside a trash can at the parking lot of Brown's Grocery.  The wallet contained pictures and a debit card but there was no cash inside it.  There were no fingerprints or DNA on the wallet.  Police also found a knife near the edge of a bean field between the grocery store and the farm shop where Al's body was found.  At trial, Danny identified the knife as the same one Harden had taken out at Al's house the night before the murder.  The blood on the knife was tested for DNA and the results were consistent with Al's DNA.

Harden testified at trial.  He denied robbing Al, killing him or having any weapons that night.  Harden admitted that he was with Al at the ATM when Al made the two cash withdrawals.  Harden testified that Al gave him about $75 for picking up Danny in Dyersberg.  Harden also testified that, as he and Al were walking away from the bank, Al fell down face-first onto some railroad tracks and rolled into a ditch.  According to Harden, Al's blood got on Harden's pants when he pulled Al out of the ditch.  Harden also claimed that he gave his shirt to Al so he could wipe his face.  Harden claimed that he and Al separated after he went to help the woman and her son load the television into their truck.

Harden was convicted of first degree murder, first degree robbery, and two counts of armed criminal action for using the concrete block as a dangerous instrument in the commission of the underlying offenses.  Following his conviction, Harden filed a direct appeal challenging the sufficiency of the evidence on all four counts. (Resp't Ex. D.)  The Missouri Court of Appeals affirmed the verdict. (Resp't Ex. G.)

Following his direct appeal, Harden filed a *pro se* Motion to Vacate, Set Aside or Correct the Judgment or Sentence pursuant to Missouri Supreme Court Rule 29.15. (Resp't Ex. I at 4-26.) Post-conviction counsel filed an amended motion, arguing that trial counsel had been ineffective in not moving to dismiss based on prosecutorial vindictiveness and in not moving to strike the testimony of Donald Booth. *Id.* at 43-65. The post-conviction motion court held a hearing and denied the motion. (Resp't Ex. J.) The Court of Appeals affirmed. (Resp't Ex. N.)

Harden then filed his Petition for Writ of Habeas Corpus in this court on February 27, 2014. [Doc 1.] The Respondent filed a response in opposition. [Doc 7.] Harden filed a reply. [Doc. 11.]

## II.     Standard of Review

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law. Judges must be vigilant and independent in reviewing petitions for the writ, a commitment that entails substantial judicial resources." *Harrington v. Richter*, 562 U.S. 86, 91 (2011). "In general, if a convicted state criminal defendant can show a federal habeas court that his conviction rests upon a violation of the Federal Constitution, he may well obtain a writ of habeas corpus that requires a new trial, a new sentence, or release." *Trevino v. Thaler*, 133 S.Ct. 1911, 1917 (2013). The Anti-Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 (AEDPA) applies to all petitions for habeas relief filed by state prisoners after this statute's effective date of April 24, 1996. *Lindh v. Murphy*, 521 U.S. 320, 326-29 (1997). In conducting habeas review pursuant to 28 U.S.C. § 2254, a federal court is limited to deciding whether a claim that was adjudicated on the merits in state court proceedings (1) resulted in a decision that is contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court, or (2) resulted in a decision that was based on

an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). A determination of a factual issue made by a state court is presumed to be correct unless the petitioner successfully rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

For purposes of § 2254(d)(1), the phrase "clearly established federal law refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state court decision." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). "In other words, clearly established federal law under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Id.* at 72. To obtain habeas relief, a habeas petitioner must be able to point to the Supreme Court precedent which he thinks the state courts acted contrary to or unreasonably applied. *Buchheit v. Norris*, 459 F.3d 849, 853 (8th Cir. 2006).

A state court's decision is "contrary to" clearly established Supreme Court precedent "if the state court either 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the] precedent.'" *Penry v. Johnson*, 532 U.S. 782, 792 (2001) (citing *Williams v. Taylor*, 529 U.S. 362, 405–406 (2000)). A state court decision is an unreasonable application of clearly established Supreme Court precedent if it correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case. *Id.* (citing *Williams*, 529 U.S. at 407–408). "A federal habeas court making the unreasonable application inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Penry*, 532 U.S. at 793. "A state court decision involves 'an unreasonable determination of the facts in light of the

evidence presented in the state court proceedings,' 28 U.S.C. § 2254(d)(2), only if it is shown that the state court's presumptively correct factual findings do not enjoy support in the record." *Evanstad v. Carlson*, 470 F.3d 777, 782 (8th Cir. 2006). A "readiness to attribute error is inconsistent with the presumption that state courts know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). AEDPA's highly deferential standard demands that state court decisions be given the benefit of the doubt. *Id*.

## III. Discussion

In his petition, Harden reasserts the claims raised in his direct appeal and his amended post-conviction motion. In Grounds 1 and 2 of his petition, he reasserts his sole points on appeal, that there was insufficient evidence to support his convictions for first degree robbery and first degree murder and corresponding armed criminal action convictions, and argues that the decision of the Court of Appeals to the contrary involved an unreasonable application of *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In Grounds 3 and 4, he reasserts the claims raised in his amended post-conviction motion that his trial counsel was ineffective in not moving to dismiss based on prosecutorial vindictiveness and in not moving to strike the testimony of Donald Booth. Respondent argues that the decisions of the state courts denying Harden's claims on the merits are reasonable and entitled to deference. For the following reasons, Harden's petition will be granted with respect to his challenge to the sufficiency of the evidence supporting his first degree robbery conviction and corresponding armed criminal action conviction, and denied in all other respects.

### A. Sufficiency of the Evidence (Grounds 1 and 2)

"[T]he Due Process Clause [of the Fourteenth Amendment] protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). "The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure." *Id.* at 363. "It is a prime instrument for reducing the risk of convictions resting on factual error [and] provides concrete substance for the presumption of innocence." *Id.* "[U]se of the reasonable-doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law." *Id.* at 364. "[A] society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt." *Id.* at 363-64.

In *Jackson v. Virginia*, the Supreme Court set forth the standard to be applied in a federal habeas corpus proceeding when the claim is made that a person has been convicted in a state court upon insufficient evidence. 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). The court rejected as too exacting the "no evidence" doctrine set forth in *Thompson v. Louisville*, which held that "a conviction based upon a record wholly devoid of any relevant evidence of a crucial element of the offense charged is constitutionally infirm." *Id.* at 314, 320. Rather, the court observed that, "*Winship* presupposes as an essential of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Id.* at 316. Accordingly, the court held that "the relevant question is whether, after viewing the evidence in the light most favorable to prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. A reasonable doubt is "one based on reason which arises from the evidence or lack of evidence." *Id.* at 317 n.9 (internal quotations omitted).

The *Jackson* standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16. It "gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* at 319. The prosecution need not "rule out every hypothesis except that of guilt beyond a reasonable doubt." *Id.* at 326. Under *Jackson*, "a federal habeas court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326. It is of no significance that the trier of fact was a judge and not a jury. *Id.* at 317 n.8. "[T]he presence of one possible 'innocent' explanation for the government's evidence does not preclude a reasonable [trier of fact] from rejecting [an] exculpatory hypothesis in favor of guilt beyond a reasonable doubt." *United States v. Maloney*, 466 F.3d 663, 667 (8th Cir. 2006). A trier of fact is "permitted to draw … inferences that are supported by the facts" and "circumstantial evidence is just as probative as any other type of evidence." *United States v. Crumley*, 528 F.3d 1053, 1065 (8th Cir. 2008). A petitioner is entitled to habeas corpus relief "if it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324.

"A judgment by a state appellate court rejecting a challenge to evidentiary sufficiency is … entitled to deference by the federal courts." *Id.* at 323. Sufficiency claims are generally evaluated under § 2254(d)(1) of AEDPA. *O'Laughlin v. O'Brien*, 568 F.3d 287, 298 (1st Cir. 2009).[2] "Under § 2254(d)(1)'s 'unreasonable application' clause … a federal habeas court may

---

[2] Harden's sufficiency of the evidence claims were adjudicated on the merits by the Court of Appeals. Although the Court of Appeals decision only cited to state law, the court applied a coextensive standard. *See State v. Grim*, 854 S.W.2d 403, 405 (Mo. 1993) (Missouri standard

not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411. "[A] federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The unreasonableness inquiry is an objective one. *Id.* at 409. Therefore, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Cavazos v. Smith*, 565 U.S. 1, 2, 132 S. Ct. 2, 4, 181 L. Ed. 2d 311 (2011). The *Jackson* standard is thus "twice-deferential." *Parker v. Matthews*, 567 U.S. 37, 132 S. Ct. 2148, 2152, 183 L. Ed. 2d 32 (2012); *Coleman v. Johnson*, 566 U.S. 650, 132 S. Ct. 2060, 2062, 182 L. Ed. 2d 978 (2012) ("We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference."). "[T]he inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Cavazos*, 565 U.S. at 2.

The scope of federal habeas review of a sufficiency claim is "extremely limited," *Skillicorn v. Luebbers*, 475 F.3d 965, 977 (8th Cir. 2007), but it is not non-existent. Section 2254 does not presume that state proceedings will *always* be without error in the constitutional sense and a federal habeas court's duty to appraise a claim of constitutional error should not be lightly abjured. *Jackson*, 443 U.S. at 323. "[W]here a state conviction has been secured at the

"echoes" *Jackson* standard); *Dansby v. Hobbs*, 766 F.3d 809, 817–18 (8th Cir. 2014) (standard "ensure[d]" application of *Jackson* standard and therefore state court of appeals decision was a merits adjudication).

expense of a constitutional right, it is this court's obligation, pursuant to section 2254, to provide habeas corpus relief." *Ward v. Lockhart*, 841 F.2d 844, 846 (8th Cir. 1988).

"A challenge to a state conviction brought on the ground that the evidence cannot fairly be deemed sufficient to have established guilt beyond a reasonable doubt states a federal constitutional claim." *Jackson*, 443 U.S. at 322. "Under *Jackson*, federal courts must look to state law for the 'substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman v. Johnson*, 566 U.S. 650, 132 S. Ct. 2060, 2064, 182 L. Ed. 2d 978 (2012) (citation omitted). It is error for a federal court to look to state law "in determining what distinguishes a reasoned inference from 'mere speculation.'" *Id*. Decisions by lower federal courts may inform the AEDPA analysis insofar as they state clearly established federal law as determined by the Supreme Court. *O'Laughlin*, 568 F.3d at 304-05.

### i. Murder and Armed Criminal Action (Ground 2)

Harden asserts that the evidence presented at his trial was insufficient to support his conviction for first degree murder and corresponding armed criminal action conviction. Harden argues that there was insufficient evidence that (1) he killed Al and (2) that he did so after a period of cool reflection, required to show deliberation. Harden raised this claim on direct appeal and it was rejected. Noting the "very strong" DNA evidence linking Harden to the crime, the Missouri Court of Appeals found that, viewed in the light most favorable to the judgment, the evidence and reasonable inferences derived therefrom were sufficient for the trial court to conclude beyond a reasonable doubt that Harden was the person who killed Al. (Resp't Ex. G at 10-11.) The court further found that there was sufficient evidence of deliberation because the evidence showed that Al had sustained multiple cuts to his neck and throat prior to sustaining the

massive blunt trauma to his head that killed him. *Id.* at 12. "Repeated blows to the victim are sufficient evidence to support a … determination of deliberation." *State v. Rhodes*, 988 S.W.2d 521, 525 (Mo. 1999). The Court of Appeals decision that the evidence was sufficient to support Harden's murder and armed criminal action convictions is entitled to deference and was neither incorrect nor unreasonable. Ground 2 is denied.

### ii.  Robbery and Armed Criminal Action (Ground 1)

Harden further asserts that the evidence presented at his trial was insufficient to support his conviction for first degree robbery and corresponding armed criminal action conviction. To convict Harden of first degree robbery, the state was required to prove beyond a reasonable doubt that Harden "forcibly stole property" from Al and "in the course of" doing so caused physical injury to Al. (Resp't Ex. G at 8.) As set forth above, the evidence was sufficient to show that Harden was the person who caused physical injury to and killed Al. Therefore, at issue is whether the evidence was sufficient to show that Harden forcibly stole property and injured Al in the course of that stealing.

"Forcible stealing is an essential element of the crime of robbery in the first degree." *State v. Kelly*, 43 S.W.3d 343, 350 (Mo. Ct. App. 2001). To prove that Harden "forcibly stole property," it was necessary for the state to prove that he (1) appropriated property owned by another, (2) without the owner's consent, (3) with the purpose to deprive the owner of the property, (4) in the course thereof, he used or threatened the immediate use of physical force upon Al, (5) for the purpose of preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking. *Id.* at 348. "[T]he distinguishing characteristic between robbery and stealing is that the former involves the use of force or the threat of force to accomplish the stealing." *Id.* "The rule in Missouri has traditionally been that

the force, violence or intimidation necessary to prove robbery must precede or be contemporaneous with the taking of the property." *Id.* at 349.[3] "Intent can be established by circumstantial evidence or inferred from surrounding facts." *State v. Williams*, 405 S.W.3d 592, 599 (Mo. Ct. App. 2013). "As used in the context of forcible stealing, 'in the course of' is a broad term, covering the whole transaction." *State v. Weems*, 840 S.W.2d 222, 228 (Mo. 1992).

While there was strong circumstantial evidence to support the inference that Harden killed Al, the circumstantial evidence was much thinner with respect to a forcible stealing. The only evidence tending to show that Harden *stole* from Al, in addition to killing him, was that (1) Al had withdrawn $220 and given some of the cash to Harden[4] and (2) Al's wallet was discovered without any cash in it in the trash can at the parking lot of Brown's Grocery. In his direct appeal, Harden argued that Al could have dropped the wallet since he was highly intoxicated and someone could have picked it up, taken out the cash, and thrown it in the trash

---

[3] The *Kelly* court noted that:

> The only change with respect to this rule came with the adoption of our current criminal code in 1977, effective January 1, 1979. In the new code, the crime of robbery, both first and second degree, as codified in § 569.020 and § 569.030, required a forcible stealing as defined in § 569.010. The definition of "forcibly steals" extended the time at which the use of force or the threat thereof may occur to include efforts to overcome resistance to "retention [of the property] *immediately after the taking.*" *§ 569.010(1)(a)* (emphasis added). Thus, the force, violence or intimidation can now occur after the taking but it must still be "in the course of stealing" in that it occurs immediately after the taking in an effort to overcome resistance to retention of the property. In other words, the force being used immediately after the taking to thwart attempts to prevent retention of the property is part of a whole, single transaction. *See Yancy,* 779 S.W.2d at 715.

43 S.W.3d at 349. The revision is not relevant to this case. There are no facts from which to draw a reasonable inference that Harden injured Al for the purpose of overcoming resistance to retention of Al's wallet.

[4] Video surveillance showed Al giving Harden some of the cash. (Resp't Ex. G at 7 n.2.) Harden testified that Al gave him $75 of the $220 as compensation for driving Danny to Dyersburg. (Resp't Ex. C at 86, 91, 94.) The day before, Al had paid Harden $70 to pick Danny up from Dyersburg. (Resp't Ex. G at 3.)

can. (Resp't Ex. D at 30.)  The Court of Appeals rejected the contention, noting that it was required to disregard contrary inferences. (Resp't Ex. G at 8.)  The court found that there was "ample circumstantial evidence" from which the trial court could have reasonably inferred that Harden robbed Al and inflicted physical injury on him in the course of doing so. *Id.* at 7.  The court further reasoned that the absence of fingerprints on the wallet did not alter this conclusion, finding that the trial court could have reasonably inferred that the wallet was wiped clean or did not retain fingerprints. *Id.* at 9.

This Court finds that no rational trier of fact could have found Harden guilty beyond a reasonable doubt of first degree robbery based on the evidence adduced at his trial and that the Court of Appeals decision involved an unreasonable application of *Jackson* and *Winship*.  The state was charged with proving beyond a reasonable doubt that Harden committed a forcible stealing, namely, that he used physical force "in the course of" and "for the purpose of" stealing. Accepting the inference that Harden stole Al's wallet, the state nonetheless failed to present any evidence of a nexus between the violence and the stealing.  Beyond some general testimony that Harden had a meager income,[5] there is no evidence that Harden had any intent to steal from Al. Moreover, the state's evidence placed Al and Harden at the pay phone at Brown's Grocery around 5:45 a.m. and then placed Harden walking shirtless along the highway near the farm shop between 7:00 a.m. and 7:30 a.m.  The shop owner discovered Al's body and called the police at 7:40 a.m. (Resp't Ex. C at 36.)  That provides a window of approximately an hour and fifteen minutes to an hour and forty-five minutes during which: Al and Harden eventually made it the 250 to 300 yards over to the farm shop, Harden brutally killed Al and dragged his body behind

---

[5] Harden testified that he was living off of unemployment after being laid off for a back injury and was drawing approximately $140 to $150 a week. (Resp't Ex. C at 86, 94.)  Danny testified that Harden was broke. *Id.* at 21.

15

the shop, and then Harden started walking down the highway back toward Brown's. The state did not present any evidence, direct or circumstantial, regarding when within that sequence of events Harden stole Al's wallet.

The *Jackson* standard "leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial" but "require[es] … that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman*, 132 S. Ct. at 2064 (quoting *Jackson*, 443 U.S. at 319). Notwithstanding the deference owed to state courts in evaluating the sufficiency of the evidence on federal habeas review, a verdict based on reasonable speculation violates due process. *United States v. Valerio*, 48 F.3d 58, 63–64 (1st Cir. 1995) ("[A]lthough the government need not exclude every reasonable hypothesis of innocence in order to sustain the conviction, we are loath to stack inference upon inference in order to uphold [a] verdict."); *Juan H. v. Allen*, 408 F.3d 1262, 1277 (9th Cir. 2005), *amended*, No. 04-15562, 2005 WL 1653617 (9th Cir. July 8, 2005) ("Although we must draw all reasonable inferences in favor of the prosecution, a 'reasonable' inference is one that is supported by a chain of logic, rather than … mere speculation dressed up in the guise of evidence."); *Newman v. Metrish*, 543 F.3d 793, 796 (6th Cir. 2008) ("Although circumstantial evidence alone can support a conviction, there are times that it amounts to only a reasonable speculation and not to sufficient evidence.").

Missouri caselaw is instructive on what constitutes a reasonable inference of forcible stealing. As in this case, in *State v. Rhodes* and *State v. Weems*, the defendants were convicted of first degree murder and first degree robbery. 988 S.W.2d 521 (Mo. 1999); 40 S.W.2d 222 (Mo. 1992). In both cases, the defendants argued that they had formed the intent to steal *after* the killing. In *Rhodes*, the defendant confessed to entering the victim's home, knocking her down, restraining her when she tried get up, and ultimately putting a plastic bag over her head

to stop her screams.  He then took her car keys and a few of her belongings, and drove away in her car.  The autopsy revealed multiple injuries, but asphyxiation from the plastic bag was the cause of death.  The Missouri Supreme Court found that the evidence was sufficient to support a reasonable inference that the violence was "for the purpose of" and "in the course of" stealing because Rhodes had admitted to entering the victim's home with the intent to steal and, in the alternative, because the violence preceded the taking. 988 S.W.2d at 526.

Similarly, in *Weems*, the defendant confessed to inflicting multiple injuries on the victim and strangling the victim to death with a lamp cord and then taking some of the victim's clothing, $40 from the victim's wallet, and the victim's car keys, and leaving in the victim's car. 40 S.W.2d at 225.  Weems argued that the state had failed to prove that he used force "for the purpose of" and "in the course of" stealing.  The Missouri Supreme Court found that the evidence was sufficient to support his conviction for first degree robbery.  The court reasoned that, "The formation of Mr. Weems' intent to take Mr. Vales' forty dollars and car might have been found to have occurred either before or during the incident, rather than after as Mr. Weems contends. The jury was not bound to accept Mr. Weems' self-serving version of the events." *Id.* at 228.

By contrast with the defendants in *Rhodes* and *Weems*, Harden did not confess to killing Al or stealing his wallet.  Thus, the trial court was left with an absence of proof as to the sequence of events and any corresponding inference regarding whether Harden used violence "for the purpose of" and "in the course of" stealing Al's wallet.  And unlike in *Rhodes*, there was no direct evidence that Harden intended to steal from Al.[6]  The trial court's adverse credibility finding with respect to Harden's testimony does not alter the state's basic failure to sustain its

_____

[6] Indeed, the First Circuit Court of Appeals, in granting habeas relief, has suggested that the brutality of an attack weighs against a robbery motive. *O'Laughlin*, 568 F.3d at 306.

burden in this regard. *See Ward*, 841 F.2d at 847 (granting habeas relief on a burglary conviction where there was no evidence connecting the petitioner to the scene of the burglary, and thus no evidence of entry, reasoning that "Ward's own testimony, though apparently disbelieved by the jury, failed to provide any further support in establishing the requisite elements"); *cf. Torres v. Lytle*, 461 F.3d 1303, 1314 (10th Cir. 2006) ("The prosecution cannot establish the existence of an element of an offense by merely pointing to the defendant's failure to produce evidence of its nonexistence.").

Here, even with due deference to the trial court, there were insufficient basic facts from which to draw a reasonable inference that Harden forcibly stole Al's wallet. While it may have been reasonable to infer that Harden stole Al's wallet, it was not reasonable to infer that he stole it forcibly, an essential element of first degree robbery. Without evidence to support a more precise sequence of events or additional evidence of Harden's intent, the trial court could not reasonably draw the inferences drawn in *Rhodes* and *Weems*. *Cf. Hurtado v. Tucker*, 245 F.3d 7, 19 (1st Cir. 2001) ("That other [state] cases with some factual similarities resulted in inferences of guilt is surely pertinent to the 'objective unreasonableness' test, but it does not eliminate the need for case by case scrutiny."). In the absence of "essential proof" as to a forcible stealing, this Court must conclude that the trial court "exceeded the bounds of legitimate inference, and engaged in speculation." *Ward*, 841 F.2d at 848. The Court finds that no rational trier of fact could have found that the evidence was sufficient to convict Harden of first degree robbery. *Jackson*, 443 U.S. at 324.

"The constitutional necessity of proof beyond a reasonable doubt is not confined to those defendants who are morally blameless." *Jackson*, 443 U.S. at 323. "Under our system of criminal justice even a thief is entitled to complaint that he has been unconstitutionally convicted

and imprisoned as a burglar." *Id.* at 323-24. Likewise, a killer and a thief does not a robber make. While it is certainly the rare case in which habeas relief is granted under *Jackson*'s highly deferential standard, this Court finds that Harden's conviction for first degree robbery was "so insupportable as to fall below the threshold of bare rationality" and that the Court of Appeals decision to the contrary was not merely erroneous, but objectively unreasonable. *Coleman*, 132 S. Ct. at 2065. The Court holds that Harden's conviction for first degree robbery and corresponding armed criminal action conviction should be set aside. *See Weems*, 40 S.W.2d at 228 (conviction for armed criminal action requires commission of the underlying felony).

### B.     Ineffective Assistance of Counsel (Grounds 3 and 4)

Next, the Court will address Harden's ineffective assistance of counsel claims. "The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results." *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). "An accused is entitled to be assisted by an attorney, whether retained or appointed who plays the role necessary to ensure that the trial is fair." *Id.* To succeed in a claim "that counsel's assistance was so defective as to require reversal of a conviction," a petitioner must establish (1) that the trial counsel's performance fell below an objective standard of reasonableness and (2) that this deficient performance prejudiced the Petitioner's defense. *Strickland*, 466 U.S. at 687-88.

The "performance" component of *Strickland* requires a showing that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. To satisfy this prong, a petitioner must first identify the specific acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. *Id.* at 690. The court must then examine the totality of the circumstances in order to determine whether "the identified

acts or omissions were outside the wide range of professionally competent assistance." *Id.* In making this determination, the court should recognize that counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

To satisfy the "prejudice" component of *Strickland*, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Such "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In determining whether prejudice exists, "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* at 695. Further, the court "should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge and jury acted according to [the] law." *Id.* at 694. "Miscues and omissions are inevitable in any case and there is no such thing as a perfect trial." *Medearis v. U.S.*, 469 F.Supp. 779, 785 (D.S.D. 2006).

It is important to note that "there is no reason for a court deciding an ineffective assistance claim to approach the [two-pronged] inquiry in [a pre-determined] order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. It is unnecessary, therefore, to prove that counsel's performance fell below an objective standard of reasonableness before determining the presence or absence of resulting prejudice.

"Taken together, AEDPA and *Strickland* establish a 'doubly deferential standard' of review." *Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012) (citing *Cullen v. Pinholster*, 563 U.S. 170) (2011)). "First, under *Strickland*, the state court must make a predictive judgment about the effect of the alleged deficiencies of counsel on the outcome of the trial, focusing on

whether it is reasonably likely that the result would have been different absent the errors." *Williams*, 695 F.3d at 831 (citing *Strickland*, 466 U.S. at 696)). "To satisfy Strickland, the likelihood of a different result must be substantial not just conceivable." *Id*. Second, under AEDPA, the Court must give substantial deference to the state court's predictive judgment. *Id*. Therefore, "[s]o long as the state court's decision was not "contrary to" clearly established federal law, the remaining question under the "unreasonable application" clause of § 2254(d) is "whether the state court's determination under the *Strickland* standard is unreasonable, not merely whether it is incorrect." *Id.* at 831 (*citing Harrington*, 562 U.S. 86 at 101). This standard is difficult, and "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102.

In Grounds 3 and 4, Harden reasserts the claims raised in his amended post-conviction motion that his trial counsel was ineffective in not moving to dismiss based on prosecutorial vindictiveness and in not moving to strike the testimony of Donald Booth. The Court will address each claim in turn.

### i. Prosecutorial Vindictiveness (Ground 3)

Harden asserts that the prosecution acted vindictively by filing its notice of intent to seek the death penalty solely to punish Harden for rejecting the state's plea offer and exercising his right to a jury trial or to force Harden to give up that right in order to have death waived. He argues that his trial counsel should have moved to dismiss the charges and/or to dismiss the notice of intent to seek the death penalty based on this vindictiveness. The following are the relevant facts.[7] After Harden's preliminary hearing on September 8, 2008, the state filed a

---

[7] These facts are taken directly from the Missouri Court of Appeals decision affirming the denial of his post-conviction motion. *Harden v. State*, 415 S.W.3d 713, 717-19 (Mo. Ct. App. 2013). A state court's determination of a factual issue shall be presumed to be correct. 28 U.S.C. § 2254.

Notice of Intent to Seek the Death Penalty on September 23, 2008. The state then filed the Information on October 7, 2008, and Harden entered a plea of not guilty that same day. Harden's initial attorney, Brandon Sanchez, filed a Motion to Withdraw on October 15, 2008, and new capital counsel, Robert Wolfrum and Beth Davis-Kerry, entered appearances on November 6, 2008. Nearly a year after the notice was filed, on September 1, 2009, Harden filed a document with the trial court indicating his waiver of the right to a jury trial in exchange for the state's agreement not to seek the death penalty. That same day, Judge Fred Copeland of the Pemiscot County Circuit Court questioned Harden about the voluntariness of his waiver; Harden stated that he "freely and voluntarily" decided to waive his right to a trial by jury and that he "trust[ed]" the trial court, specifically Judge Copeland. The trial court then accepted Harden's waiver.

> The Court of Appeals set forth the following standard for prosecutorial vindictiveness:
>
> There are two ways to prove prosecutorial vindictiveness: (1) "if a realistic likelihood of vindictiveness is found, a presumption is erected in [the] defendant's favor[,] which the prosecutor must rebut"; or (2) "a defendant can make a case for prosecutorial vindictiveness without the aid of the ... presumption if he can prove, through objective evidence[,] that the sole purpose of the State's action was to penalize him for exercising some right." *State v. Potts,* 181 S.W.3d 228, 233–34 (Mo.App.2005) (citing *United States v. Goodwin,* 457 U.S. 368, 380 n. 4, 384, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982)). "Reasonable likelihood" is determined by weighing two factors: (1) the prosecutor's stake in deterring the exercise of the right being asserted; and (2) the prosecutor's actual conduct. *State v. Cayson,* 747 S.W.2d 155, 158 (Mo.App.1987).

*Harden v. State*, 415 S.W.3d 713, 718 (Mo. Ct. App. 2013).

At the evidentiary hearing on Harden's amended post-conviction motion, the court received depositions into evidence from Harden, his three defense attorneys, and Michael Hazel, the prosecutor. (Resp't Ex. K.) Both the post-conviction motion court and the Court of Appeals denied Harden's claim that counsel was ineffective in not moving to dismiss based on

prosecutorial vindictiveness. *Harden*, 415 S.W.3d at 719; Resp't Ex. J at 10. The Court of Appeals found that by his own admission Harden was unaware of any plea offer until some time after the state filed its notice when Wolfrum conveyed a plea offer of twenty years. *Harden*, 415 S.W.3d at 719. The court concluded that, as such, it was impossible that the state had filed the notice solely to punish Harden for asserting his right to trial. *Id*.

Harden argues that the Court of Appeals decision is contrary to *United States v. Goodwin*, 457 U.S. 368 (1982). However, in *Goodwin* and the cases discussed therein, the defendant exercised some legal right *before* the alleged vindictive action by the state. Indeed, the question before the Supreme Court in *Goodwin* was whether such timing should give rise to a presumption of vindictiveness in the pretrial setting. 457 U.S. at 380–81. Here, Harden did not receive and reject the state's plea offer until after the notice was filed.

Harden further argues that the state had a vindictive motive because there was no new evidence or aggravating circumstances that justified filing of the notice. This argument is without merit. The state filed its notice relatively early in the proceedings, prior to the filing of formal charges, and Harden does not allege that there was an inadequate basis for seeking the death penalty. *See id.* at 372-73 (imposition of punishment is purpose of criminal proceedings, so punitive motivation alone is not an adequate basis for distinguishing vindictive state action); *id.* at 381 (inflexible presumption of vindictiveness is not warranted in pretrial context where prosecutor may come to realize the information possessed by the state has broader significance).

In addition, there is no evidence of actual vindictiveness—Harden does not allege that Hazel himself somehow suggested that the notice was filed to influence Harden's conduct. *Id.* at 380–81. Finally, the fact that Harden waived his right to a jury trial to avoid the death penalty does not give rise to a presumption of prosecutorial vindictiveness. *See Brady v. United States*,

397 U.S. 742, 755, 90 S. Ct. 1463, 1472, 25 L. Ed. 2d 747 (1970) ("[A] plea of guilty is not invalid merely because entered to avoid the possibility of a death penalty."). Counsel was not ineffective in failing to file a motion to dismiss that would have been meritless. The decision of the state courts on this issue is entitled to deference and was neither incorrect nor unreasonable. Ground 3 is denied.

### ii.       Testimony of Donald Booth (Ground 4)

Harden also asserts that counsel was ineffective in not moving to strike the testimony of Donald Booth. Booth's testimony at the preliminary hearing was inconsistent with his testimony at trial. At the preliminary hearing, Booth testified that a white man helped him load a TV into his mother's truck. (Resp't Ex. B at 47.) When asked if he saw the man go over to the bottom part of a porch on the lot adjacent to his mother's house, he testified that he was not paying attention and that he never told the police that he saw someone put something somewhere. *Id.* at 48. He then testified that he saw a red handkerchief under the porch and could not remember anything else he saw. *Id.* 48-49.

At trial, Booth testified that he saw the man throw clothes under the porch and that he told the police about it. (Resp't Ex. C at 50.) On cross-examination, he acknowledged his prior testimony. *Id.* at 50-51. In response to questioning from the trial court, he again testified, contrary to his testimony at the preliminary hearing, that he saw the man wad something up in his hand and throw it under the porch. *Id.* at 51. Booth then testified that when his mother left to drive the man to Kennett, Booth went and looked under the porch and saw whatever was there. *Id*. He initially testified that he did not tell anybody what he saw but then testified that he told the chief of police. *Id*. He testified that in addition to the red handkerchief, he saw a t-shirt and hat under the porch. *Id.* at 51-52. Following Booth's testimony, the trial judge stated that he

understood that Booth had given conflicting testimony and that he would note portions of Booth's preliminary hearing testimony that he "read into the record in attempting to impeach [Booth's] testimony … with his prior inconsistent statements." *Id.* at 52. The court then took judicial notice of all of Booth's testimony at the preliminary hearing. *Id.*

Both the post-conviction motion court and the Court of Appeals denied Harden's claim that counsel was ineffective in not moving to strike Booth's testimony. *Harden*, 415 S.W.3d at 720; Resp't Ex. J at 10. The Court of Appeals found that the inconsistencies in Booth's testimony went to the weight of the evidence, not its admissibility, and therefore any motion to strike would have been denied. *Harden*, 415 S.W.3d at 720.

The Court of Appeals did not consider Harden's argument that Booth should have been struck because he did not have sufficient first-hand knowledge, citing *State v. Irby*, 254 S.W.3d 181, 195 (Mo. Ct. App. 2008) for the proposition that the court will not consider arguments raised in the argument portion of a brief that were not encompassed in the points relied on. *Id.* at 10 n.4. This briefing rule does not foreclose federal habeas review. *Moore v. Luebbers*, No. 4:05-CV-322, 2008 WL 782873, at *6 (E.D. Mo. Mar. 20, 2008). Harden's basic argument was discernible from his brief. *Id.* His point relied on contained a summary of Booth's testimony, including the assertion that Booth never testified that he saw Harden place a shirt and hat under the porch, and the Argument section specifically raised Booth's lack of first-hand knowledge. (Resp't Ex. L at 35, 49.)

Counsel Robert Wolfrum testified that he did not move to strike Booth's testimony because he felt that impeachment with the prior inconsistent statements was the appropriate remedy. (Resp't Ex. L at 50.) Counsel's decision did not fall below an objective standard of reasonableness. *Strickland*, 466 U.S. at 690. It is far from clear that counsel would have

prevailed on a motion to strike based on lack of first-hand knowledge. "Generally, a witness may only testify to those matters of which the witness has personal first-hand knowledge." *State v. Taylor*, 466 S.W.3d 521, 529 (Mo. 2015). Here, there is no question that Booth had personal first-hand knowledge of Harden on the day of the murder. While some of his testimony at the preliminary hearing contradicted his testimony at trial, he was consistent that Harden helped load a TV into his mother's truck and that he saw something under the porch on the lot adjacent to his mother's house. Moreover, there is at least some evidence that he had personal first-hand knowledge of Harden throwing something under the porch, namely, Booth's testimony at trial to that effect. *See* Fed. R. Evid. 602 ("Evidence to prove personal knowledge may consist of the witness's own testimony.").

Faced with a motion to strike, the trial court could well have found that Booth's prior inconsistent statements went to the weight and credibility of his testimony, rather than his competency as a witness. *See State v. Gray*, 230 S.W.3d 613, 620 (Mo. Ct. App. 2007) ("Conflicts between a witness's trial testimony and previous testimony or statements are for the trial court to reconcile in assessing credibility."); *Zempel v. Slater*, 182 S.W.3d 609, 616 (Mo. Ct. App. 2005) ("[E]quivocation and problems with recall in the [witness's] testimony go to the weight of this testimony, not its admissibility"); *Mitchell v. Kardesch*, 313 S.W.3d 667, 675 (Mo. banc 2010) (impeachment "provides a tool to test a witness's perception, credibility, and truthfulness, which is essential because a [trier of fact] is free to believe any, all, or none of a witness's testimony."). Furthermore, counsel ensured that the trial court considered the inconsistencies in Booth's testimony and took judicial notice of his testimony at the preliminary hearing and therefore any prejudice to Harden from the admission of Booth's testimony was minimal. The Court finds that trial counsel was not ineffective in failing to move to strike

Booth's testimony.  The decision of the state courts on this issue is entitled to deference and was neither incorrect nor unreasonable.  Ground 4 is denied.

## IV.     Conclusion

Based on the foregoing, the Court finds that Harden's request for relief pursuant to 28 U.S.C. § 2254 should be granted in part and denied in part.  The Court will set aside Harden's conviction for first degree robbery and corresponding armed criminal action conviction as based on insufficient evidence in violation of the Due Process Clause of the Fourteenth Amendment. *Jackson*, 443 U.S. at 324.  However, Harden is not entitled to release as he is confined for a concurrent term of equal length on his remaining conviction for first degree murder and corresponding armed criminal action conviction.  Because Harden has made no showing of denial of a constitutional right with respect to his remaining convictions, the Court will not issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(2); *Tiedeman v. Benson*, 122 F.3d 518, 522 (8th Cir. 1997).

Accordingly,

**IT IS HEREBY ORDERED** that Joseph Harden's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 is **GRANTED** with respect to Petitioner's conviction for first degree robbery and corresponding armed criminal action conviction, based on Ground 1 as discussed above, and **DENIED** on all other claims. [Doc. 1.]

**IT IS FURTHER ORDERED** that Joseph Harden's conviction for first degree robbery and corresponding armed criminal action conviction will be set aside with prejudice to reprosecution. *See Burks v. United States*, 437 U.S. 1, 18, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) (holding that "the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient").

**IT IS FURTHER ORDERED** that a separate judgment will be entered this same date.

**IT IS FINALLY ORDERED** that, for the reasons stated herein, any motion by Joseph Harden for a Certificate of Appealability will be **DENIED**.

Dated this <u>12th</u> day of April, 2017.

        <u>/s/ Nannette A. Baker       </u>
        NANNETTE A. BAKER
        UNITED STATES MAGISTRATE JUDGE